# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

GEORGE BYRD                                                              PLAINTIFF

V.                                            CIVIL ACTION NO. 1:14cv125-KS-MTP

HUNTINGTON INGALLS, INCORPORATED                                        DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Defendant Huntington Ingalls,

Incorporated's Motion for Summary Judgment [28].  Having considered the submissions

of the parties, the record, and the applicable law, the Court finds that the motion should

be granted in part and denied in part.

## I.  BACKGROUND

This action involves alleged employment discrimination in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  Plaintiff George

Byrd was employed by Huntington Ingalls, Incorporated ("Huntington"), and its

predecessors in interest, as a sheet metal mechanic in its shipyard in Pascagoula,

Mississippi for approximately thirty-three (33) years.  Byrd's employment with

Huntington was terminated on April 24, 2012.  Huntington's position is that Byrd was

discharged as a result of an incident occurring on March 21, 2012, in which Byrd left his

workstation without permission, absconded with a company-owned Kawasaki Mule

vehicle that resembles a golf cart (the "Mule"), and wrecked the Mule on his way out of

the shipyard.  According to the Complaint, Byrd claims that he was terminated because

of his age and because Huntington regarded him as disabled.  Byrd was fifty-four (54)

years old at the time of his termination and has Type 2 diabetes.  Further, Byrd was placed under certain work restrictions relating to a shoulder injury in January of 2012. Byrd also alleges that he was subjected to a hostile work environment in violation of the ADA and ADEA in March of 2012.

Byrd began working at the shipyard in 1975.  (*See* Huntington 30(b)(6) Dep. [35-3] 10:9-18.)  Byrd left this employment in 2005 due to Hurricane Katrina.  (*See* Byrd Decl. [35-1] at ¶ 2.)  Byrd rejoined the shipyard in April of 2009 in a supervisory position, and stayed in that role until February of 2010, when he voluntarily went back "to the hands-on, non-supervisory work" that he enjoyed the most and presented less stress. (*See* Byrd Decl. [35-1] at ¶ 2.)

Byrd injured his right shoulder at work in 2010, and then reinjured it in January of 2012 in connection with falling out of a forklift.  (*See* Byrd Dep. [35-2] 6:25-7:16.)  On January 24, 2012, Dr. Donnis Harrison, an orthopedic surgeon, released Byrd to return "to light duty work" under the following restrictions:  "No overhead work.  No lifting over 15 pounds."  (Orthopedic Records attached to Byrd Decl. [35-1 at ECF p. 8].)  These restrictions remained in place through March 21, 2012, the last day Byrd actually worked at the shipyard.  (*See* Byrd Dep. [35-2] 11:4-6.)

Byrd was initially assigned light duty work upon his return to the shipyard in late January of 2012.  (*See* Byrd Dep. [35-2] 11:7-10.)  Byrd worked with Robert Hardy at that time.  Generally, Byrd operated a forklift or crane and Hardy performed the manual tasks.  (*See* Byrd Dep. [35-2] 11:11-20.)  Byrd did not exceed his restrictions while working with Hardy.  (*See* Byrd Dep. [35-2] 12:4-7.)

Byrd contends that his problems at work relating to this litigation started in March

of 2012, when he began to work for foreman Ryan Rawls.  On or about March 12, Rawls and Byrd had a discussion regarding Byrd's restrictions and Rawls told Byrd he "ought to go have it [shoulder surgery] done, you know, get it done faster."  (Byrd Dep. [35-2] 16:12-22.)[1]  Also on or about this date, Rawls gave Byrd an assignment, the details of which Byrd could not recall at his deposition, that exceeded Byrd's restrictions.  (*See* Byrd Dep. [35-2] 12:23-13:5.)  Byrd completed the assignment without advising Rawls that it violated his restrictions.  (*See* Byrd Dep. [35-2] 13:14-22.)  On or about March 19, Rawls assigned Byrd "a big ventilation job" that involved 11-gauge galvanized steel.  (*See* Byrd Dep. [35-2] 12:23-25, 13:23-14:8.)  Byrd told Rawls that the job was too big and outside of his restrictions.  (*See* Byrd Dep. [35-2] 14:6-8.)  Rawls then "went and found . . . [Byrd] another little job" that he was capable of performing.  (Byrd Dep. [35-2] 14:18-23.)  On March 20, Rawls told Byrd to roll some sheets of aluminum.  (*See* Byrd Dep. [35-2] 17:17-18:6.)  Byrd believed that the weight of the sheets exceeded his restrictions, but he did not advise Rawls of this circumstance.  (*See* Byrd Dep. [35-2] 20:24-21:10.)  While Byrd was waiting for another employee to finish using a mechanical roller, Rawls told Byrd to go ahead and use a manual roller, which was larger and more difficult to operate.  (*See* Byrd Dep. [35-2] 19:21-20:12.)  Byrd started hurting after rolling one sheet of aluminum; he thus stopped and went and told Rawls that he was in pain and that the roller was too heavy for him.  (*See* Byrd Dep. [35-2] 21:12-19.)  Rawls stated, "[W]ell, we don't want you to hurt yourself but we need to get

---

[1] In his post-deposition declaration, Byrd describes Rawls' statement as follows: Rawls "told me I . . . 'should have the surgery done under insurance instead of workers comp,' stating that is 'what [he] did when [he] hurt his knee on a ship.'"  (Byrd Decl. [35-1] at ¶ 5.)

that one out." (Byrd Dep. [35-2] 21:20-24.)  It is not clear if Byrd rolled any more sheets

of aluminum based on the following deposition testimony:

> Q.    Okay.  After Rawls said, we don't want you to hurt yourself, did you roll
>        anything else or do you remember?
>
> A.    I don't think I rolled anymore.  I think I rolled one or two, then stopped
>        because I was hurting.

(Byrd Dep. [35-2] 22:2-6.)

Matters came to a head for Byrd during his shift on March 21.  At the beginning

of the shift, Byrd learned that the only work available was a task involving galvanized

steel that exceeded his restrictions.  (*See* Byrd Dep. [35-2] 27:20-28:14.)  Byrd and

general foreman Tommy Bennett, who was over both Byrd and Rawls, then had a

heated discussion regarding Byrd's restrictions and available job assignments.  At some

point, Bennett stated that Rawls had told him Byrd "wanted to go sit over there and wait

for Reggie to get through" with the mechanical roller the previous night.  (Byrd Dep. [35-

2] 28:19-23.)[2]  Byrd took offense to this statement and replied that he "didn't go over

there to sit down and wait on him all night."  (Byrd Dep. [35-2] 28:19-23.)  Byrd

subsequently told Bennett that he had to find work within his restrictions or Bennett

could send him home.  (*See* Byrd Dep. [35-2] 29:11-13.)  Bennett advised Byrd that he

would not be paid if he went home.  (*See* Byrd Dep. [35-2] 29:13-15.)  Byrd also told

Bennett that he had been at the shipyard for thirty (30) years and did not feel like he

was being treated right.  (*See* Byrd Dep. [35-2] 37:4-5.)  Bennett then made a remark to

_____

[2] In his post-deposition declaration, Byrd describes this statement as follows: Bennett
openly repeated Rawls' "accusation that I 'just want to sit on [my] butt for hours.'"  (Byrd
Decl. [35-1] at ¶ 6.)

the effect that "everybody that's been here 30 years is gone . . . ." (Byrd Dep. [35-2] 37:6-8.) Purportedly, Bennett was grinning and smiling, which got under Byrd's skin. (*See* Byrd Dep. [35-2] 31:17-21.) Byrd eventually said something he "shouldn't have," when he asked Bennett "if he was F'ing deaf because" the two were "just going back and forth saying the same thing" regarding work available for Byrd within his restrictions. (Byrd Dep. [35-2] 29:21-24.) Bennett then told Byrd to go back to his work table and that he would find something for Byrd to do. (*See* Byrd Dep. [35-2] 34:4-7.) Bennett threw a small job, something that would take one or two hours to complete, on Byrd's table approximately twenty to thirty minutes later. (*See* Byrd Dep. [35-2] 29:25-30:3, 34:13-24.) This job was within Byrd's restrictions. (*See* Byrd Dep. [35-2] 34:25-35:1.) Bennett also asked work leaderman Criss Tanner to prepare some additional small tasks for Byrd. (*See* Tanner Decl. [28-4] at ¶ 3; Byrd Dep. [35-2] 91:12-22; Bennett Decl. [37-2] at ¶ 5.)

Byrd worked on the job given to him by Bennett for a few minutes until he saw shot superintendent Darrel Brewer, who was Bennett's boss, walk through the area. (*See* Byrd Dep. [35-2] 35:9-36:11.) Byrd went and spoke to Brewer because he was worried that after he finished the small job he would have to work on the other job that exceeded his restrictions. (*See* Byrd Dep. [35-2] 35:12-17.) After Byrd told Brewer about his interactions with Bennett, Brewer said, "[W]e don't want you to work past your restriction. . . . I'll talk to Tommy [Bennett] tomorrow, we'll take care of this." (Byrd Dep. [35-2] 37:14-22.) Brewer also told Byrd not to do anything that exceeded his restrictions. (*See* Byrd Dep. [35-2] 79:25-80:8.) Byrd then went back to his work area. (*See* Byrd Dep. [35-2] 38:18-20.) Byrd did not complete the small job given to him by

Bennett. (*See* Byrd Dep. [35-2] 39:4-5.) Byrd spoke to co-worker Alex McMillan for a minute; then his nose started to bleed and his glasses fogged up. (*See* Byrd Dep. [35-2] 39:6-13.) Everything then went "blank" and the next thing Byrd remembered was calling his wife while driving home from the shipyard. (*See* Byrd Dep. [35-2] 40:8-19.)

The summary judgment record evidences the following particulars during Byrd's blackout. Byrd walked out of the shop and drove away in the company-owned Mule, which he was not authorized to operate. (*See* Tanner Decl. [28-4] at ¶ 3; Craft Decl. [28-5] at ¶ 3;[3] Byrd Dep. [35-2] 54:14-16.) Byrd ran the Mule into a port-a-john with such force that he was thrown from the vehicle. (*See* Craft Decl. [28-5] at ¶ 3.) He then got back into the Mule and proceeded to drive toward the company gate. (*See* Craft Decl. [28-5] at ¶ 3.) Byrd drove past Steve Craft and asked, "What the f_ _ _ are you looking at?" (Craft Decl. [28-5] at ¶ 3.) Craft followed on foot and noticed that Byrd had also driven the Mule into a garbage can near the shipyard gate. (*See* Craft Decl. [28-5] at ¶ 3.) Craft reported the incident to the security department. (*See* Craft Decl. [28-5] at ¶ 3.) A Security Report [28-6] from the shipyard indicates that Byrd was charged with reckless driving, two counts of hit and run, and stealing a company vehicle.

Byrd was shaky and confused when he arrived home from the shipyard. (*See* Melissa Byrd Decl. [35-4] at ¶ 7.) Byrd's wife, Melissa Byrd, prepared him a banana and soft drink, while his adult son, John Byrd, asked him what happened. Byrd was unable to provide intelligible answers. (*See* Melissa Byrd Decl. [35-4] at ¶ 7; John Byrd Decl. [35-5] at ¶ 4.) Byrd's wife and son then took him to the emergency room at

---

[3] Steve Craft is employed by Huntington as a production planner and scheduler. (*See* Craft Decl. [28-5] at ¶ 2.)

Singing River Hospital.  (*See* Melissa Byrd Decl. [35-4] at ¶ 9; John Byrd Decl. [35-5] at ¶ 5.)  The medical record from this visit indicates, *inter alia*, that Byrd was alert and oriented; that there was a scrape on Byrd's right wrist, but it was not fractured; and, that Byrd's blood sugar was within normal limits.  (*See* Hospital Records [28-8]; Byrd Dep. [35-2] 67:2-15.)  Byrd was discharged in stable condition.  Byrd and his wife contend that the emergency room physician said the incident was likely caused by a blood sugar imbalance, although there is nothing in the medical record to that effect.  (*See* Byrd Decl. [35-1] at ¶ 8; Melissa Byrd Decl. [35-4] at ¶ 9.)  Also, Byrd's family physician purportedly told him at some point that his blood "sugar fell out" that night.  (Byrd Dep. [35-2] 81:15-19, 112:17-23.)

Byrd never returned to work for Huntington at the shipyard.  (*See* Byrd Dep. [35-2] 77:13-15.)  A psychologist employed by Huntington told Byrd's wife either that he should stay home until he could be seen by his treating physician or that he should take off the rest of the week.  (*See* Byrd Dep. [35-2] 76:23-77:8; Melissa Byrd Decl. [35-4] at ¶ 10.)  On March 27, Byrd's orthopedist, Dr. Harrison, excused Byrd from work pending his shoulder surgery, which was scheduled for April 3.  (*See* Orthopedic Records attached to Byrd Decl. [35-1 at ECF p. 9]; Byrd Dep. [35-2] 78:12-14.)  Byrd underwent shoulder surgery on April 3.  (*See* Byrd Decl. [35-1] at ¶ 10.)

At Huntington's request, Byrd reported to the shipyard on April 24 for a meeting with Brewer, Jerry Shelly (a union steward), and James Moss (a labor relations representative).  (*See* Moss Decl. [28-1] at ¶¶ 2, 4; Byrd Dep. [35-2] 52:21-53:5.)  Moss had previously conducted an investigation regarding the March 21 incident and made the decision, in coordination with his supervisor Ray Doty, that Byrd should be

discharged for misconduct.  (*See* Moss Decl. [28-1] at ¶¶ 3-4.)  At the meeting, Byrd

was notified that he was being terminated for misconduct.  (*See* Moss Decl. [28-1] at ¶

4; Byrd Dep. [35-2] 51:20-22.)  Byrd understood that the misconduct encompassed him

leaving his workstation, taking the Mule without authority, wrecking the Mule, and

walking out of the gate.  (*See* Byrd Dep. [35-2] 51:23-52:2.)  Moss asked Byrd about his

blood sugar on the date of the incident and Byrd stated that it was normal according to

the hospital records.  (*See* Moss Decl. [28-1] at ¶ 4; Byrd Dep. [35-2] 67:16-68:1.)[4]

Moss also asked Byrd what happened and Byrd stated, "They knew I was hurt and I

couldn't pull my load and they wouldn't -- they just kept pushing me."  (Byrd Dep. [35-2]

68:24-69:2.)  Byrd also told Moss, "I don't remember nothing.  I don't remember none of

that."  (Byrd Dep. [35-2] 71:13-14.)  Byrd did not tell Moss about his glasses fogging up

or his nose bleeding at the time of the incident.  (*See* Byrd Dep. [35-2 ] 69:24-70:5.)

On September 21, 2012, Byrd filed his Charge of Discrimination [28-2] with the

Equal Employment Opportunity Commission ("EEOC").  On July 31, 2013, the EEOC

terminated its proceeding and issued its Notice of Right to Sue [28-11].  On October 17,

2013, Byrd filed suit against Huntington in the Circuit Court of Jackson County,

Mississippi.  (*See* Compl. [1-2 at ECF p. 6].)  In addition to alleging violations of the

ADA and ADEA, the Complaint asserts a state law claim for intentional infliction of

emotional distress.  On March 12, 2014, Huntington removed the proceeding to this

Court on the basis of federal question subject matter jurisdiction under Title 28 U.S.C. §

_____

[4] In his post-deposition declaration, Byrd claims he told Moss that his blood sugar
was taken at the hospital several hours after he was able to consume a soft drink and
banana.  (*See* Byrd Decl. [35-1] at ¶ 9.)

-8-

1331 and supplemental jurisdiction under 28 U.S.C. § 1367. (*See* Notice of Removal [1].) On March 19, 2014, Huntington filed its Answer [4], denying any and all liability. Huntington also asserts a counterclaim on the basis that "Byrd's actions, whether negligent or intentional, damaged the . . . [Mule] beyond repair." (Answer [4] at p. 7.)

On February 13, 2015, Huntington filed its Motion for Summary Judgment [28]. Huntington contends that it is entitled to judgment as a matter of law on Byrd's claims and its counterclaim. The motion has been fully briefed and the Court is ready to rule.

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the burden of production at trial ultimately rests on the nonmovant, 'the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case.'" *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (quoting *Shields v. Twiss*, 389 F.3d 142, 149 (5th Cir. 2004)). However, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the movant meets his burden, the nonmovant must go beyond the pleadings and point out specific facts showing the existence of a genuine issue for trial. *Cannata v. Catholic*

*Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citation omitted). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra*, 626 F.3d at 812 (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citing *Sec. & Exch. Comm'n v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

## B.     Analysis

### 1.     Hostile Work Environment Under the ADA and ADEA

As an initial matter, Huntington asserts that Byrd's hostile work environment claims under the ADA and ADEA are time-barred. "A Title VII claimant must file charges with the EEOC within 180 days after the alleged illegal conduct." *Hood v. Sears Roebuck & Co.*, 168 F.3d 231, 232 (5th Cir. 1999) (citing 42 U.S.C. § 2000e-5(e)(1)). A plaintiff alleging discrimination under the ADEA must also file an EEOC

charge "within 180 days after the alleged unlawful practice occurred." *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011) (quoting 29 U.S.C. § 626(d)(1)(A)). The ADA incorporates by reference Title VII's administrative prerequisites for filing suit in federal court. *See* 42 U.S.C. § 12117(a); *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996). The 180-day period acts as a statute of limitations. *See Hood*, 168 F.3d at 232 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)). Discrete employment actions, "such as termination, failure to promote, denial of transfer, or refusal to hire," occurring more than 180 days before an EEOC charge is filed are not actionable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Under a continuing violation theory of recovery such as a hostile work environment claim, "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004) (citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)). This is because a hostile work environment claim is comprised of multiple "acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

Huntington asserts that Byrd never worked at the shipyard subsequent to March 21, 2012, and could not have been subjected to a hostile environment based on age or disability after that date. Further, Byrd's hostile environment claims are time-barred because Byrd submitted his EEOC charge on September 21, 2012, 184 days subsequent to March 21. Byrd invokes the continuing violation doctrine in opposition to

dismissal.  Huntington bears the burden of proof with respect to establishing its statute of limitations affirmative defense.  *See Citigroup, Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011) (citing *Fontenot*, 780 F.2d at 1194).  Yet, the burden of demonstrating the applicability of the continuing violation doctrine lies with Byrd.  *See Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 Fed. Appx. 346, 349-50 (5th Cir. 2010) ("This court has repeatedly held that 'the continuing violation doctrine does not automatically attach in hostile work environment cases, and *the burden remains on the employee* to demonstrate an organized scheme led to and included the present violation.'") (quoting *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001), and citing *Stewart v. Miss. Transp. Com'n*, 586 F.3d 321, 328 (5th Cir. 2009)).

The Court determines that Huntington has met its summary judgment burden, while Byrd has fallen short of showing the existence of a hostile work environment both outside of and within the limitations period.  The only act of alleged discrimination occurring within 180 days of the filing of Byrd's EEOC charge was his termination on April 24, 2012.  Discrete employment actions such as termination constitute separate actionable employment practices, are different in kind from hostile environment claims, and "do not make timely acts that fall outside the [statutory] time period."  *Morgan*, 536 U.S. at 112, 114, 115 (citation omitted); *see also Parker v. La. Dep't of Educ. Special Sch. Dist.*, 323 Fed. Appx. 321, 327 (5th Cir. 2009) (holding that the plaintiff's termination could not be considered an incident of a hostile environment).  Byrd's hostile work allegations concern comments purportedly made by two supervisors, Ryan Rawls and Tommy Bennett, and work assignments allegedly exceeding Byrd's light-duty work

restrictions.  It is undisputed that Byrd neither received any work assignments nor was

subjected to any statements from Rawls or Bennett subsequent to his last day of work

at the shipyard on March 21.  Moreover, labor relations representatives James Moss

and Ray Doty, as opposed to Rawls and Bennett, made the determination to fire Byrd.

(*See* Moss. Decl. [28-1] at ¶ 4.)  Byrd testified at deposition that "I don't believe my

bosses would have fired me."  (Byrd. Dep. [35-2] 52:11-12.)  Based on these particulars,

Byrd has failed to present "a valid connection between the acts suggesting a hostile

work environment and his termination which dealt with disparate treatment."  *Estate of*

*Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 913 (5th Cir. 2000) (finding the plaintiff's

hostile work environment claims to be untimely even though he was terminated within

the 180-day period); *cf. Ross v. Baylor Coll. of Med.*, No. H-08-3080, 2010 WL

2710397, at *10  (S.D. Tex. July 7, 2010) (holding that the plaintiff's termination was not

a cognizable component of her hostile environment claim) (citations omitted).  Byrd's

hostile work environment claims, based on circumstances occurring no later than March

21, 2012, are time-barred.

Huntington is entitled to summary judgment even overlooking the fact that Byrd

failed to file charges with the EEOC within 180 days of allegedly being subjected to a

hostile work environment.  Byrd must prove "that the harassment complained of affected

a term, condition, or privilege of employment" in order to recover under the ADA.

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001) (quoting

*McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).  Stated

differently, but having the same meaning, an age-based hostile environment claim

requires a claimant to show that "the nature of the harassment was such that it created

an objectively intimidating, hostile, or offensive work environment." *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011) (citing *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834-35 (6th Cir. 1996)).[5]  A workplace is impermissibly hostile if "it is 'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment.'" *Id.* (quoting *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009), a Title VII case).  The environment must be hostile both subjectively, to the plaintiff, and objectively, to a reasonable person.  *See id.* (citation omitted).  A court is to consider the following circumstances in making the determination:  "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Flowers*, 247 F.3d at 236 (citations omitted).  Neither offhand comments, occasional teasing, rudeness, nor isolated incidents of derogatory behavior will give rise to liability.  *See Jackson v. Honeywell Int'l, Inc.*, No. 13-20575, 2015 WL 585882, at *7 (5th Cir. Feb. 12, 2015) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275 (1998)).

The Court must first separate the summary judgment facts from Byrd's "[c]onclusional allegations . . ., speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation" regarding workplace harassment.  *Oliver*, 276 F.3d at 744.  Byrd's briefing in opposition to summary judgment argues that Rawls and Bennett, both "significantly younger" than Byrd, worked together in an organized

---

[5] The other elements of a hostile environment claim under the ADA and ADEA need not be addressed given the Court's ruling as to this requirement.

scheme, "targeting Mr. Byrd because he was not physically able to carry his normal load after two work injuries and a frozen shoulder." (Pl.'s Mem. in Opp. to Mot. for SJ [36] at p. 21.) As proof of Bennett and Rawls' concerted actions, Byrd references a conversation between Rawls and himself regarding Byrd's surgery plans and work restrictions, which Bennett "was obviously listening in on" and interrupted by announcing that Rawls "says you just want to sit on your butt." (Pl.'s Mem. in Opp. to Mot. for SJ [36] at p. 21.) First, Tommy Bennett is only approximately five (5) years younger than Byrd. (*See* Bennett Decl. [37-2] at ¶ 3.)[6] Second, Byrd's sworn deposition testimony negates any contention that Bennett was listening to and interrupted a conversation between Byrd and Rawls. Byrd consistently testified that he had no recollection of speaking with Rawls on March 21, the date Bennett "said that Rawls had told him I wanted to go sit over there and wait for Reggie to get through all night." (*See* Byrd Dep. [35-2] 27:20-28:25, 31:10-12; 61:9-11, 80:17-20.) Sheer speculation aside, the Court cannot presume that two supervisors, Rawls and Bennett, were part of a nefarious plot to get rid of an employee, Byrd, simply because they spoke about him outside of his presence. Third, both Byrd and Bennett have stated that outside of their exchange on

_____

[6] The Court is not mandated to accept Byrd's belief regarding Bennett's age even though it is repeated in his declaration. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007); *cf. Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 98 (5th Cir. 1993) (providing that conclusory affidavit testimony fails to create a fact issue precluding summary judgment) (citations omitted). No reasonable jury would adopt Bryd's subjective belief that Bennett is "significantly younger, 30's," in the face of Bennett's own statement, listing his date of birth as September 14, 1962 and including a copy of his driver's license showing that date. (*Compare* Byrd Decl. [35-1] at ¶ 6, *with* Bennett Decl. [37-2] at ¶ 3.)

-15-

March 21, in which Byrd cursed Bennett, the two got along well at work. (*See* Byrd Dep. [35-2] 33:10-24; Bennett Decl. [37-2] at ¶¶ 5, 7.) Byrd has also stated, "I don't believe my bosses would have fired me." (Byrd. Dep. [35-2] 52:11-12.) Based on the preceding record evidence, Byrd's speculative argument that his supervisors were involved in a scheme to terminate his employment fails to create a genuine issue of material fact. *See VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 455 (5th Cir. 2011) ("[A] party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions.") (citation omitted).

Byrd's argument that he was subjected to "physically threatening and abusive conditions" on March 21, 2012, is also unsupported by the summary judgment record and thus legally inoperative. (Pl.'s Mem. in Opp. to Mot. for SJ [36] at p. 22.) Byrd fails to cite any evidence in aid of the contention that he was physically threatened by anyone at the shipyard on March 21 or at any other time. Further, Byrd has admitted not being assigned any work that exceeded his restrictions on that date. (*See* Byrd Dep. [35-2] 65:1-6.) There is evidence to the effect that Byrd was worried about having to work on a task that exceeded his restrictions after he completed the small job given to him by Bennett. (*See* Byrd Dep. [35-2] 35:12-17.) However, it appears that this subjective belief was objectively unreasonable. Bennett had also instructed Criss Tanner to prepare some additional small tasks for Byrd. (*See* Tanner Decl. [28-4] at ¶ 3; Byrd Dep. [35-2] 91:12-22; Bennett Decl. [37-2] at ¶ 5.) Moreover, Bennett's boss, Darrel Brewer, told Byrd not to do anything that exceeded his restrictions. (*See* Byrd Dep. [35-2] 36:8-11, 79:25-80:8.) It was also Byrd, as opposed to his supervisors, who swore at two individuals on March 21. (*See* Byrd Dep. [35-2] 29:21-24, 33:10-12;

Craft Decl. [28-5] at ¶ 3.)

Several statements in Byrd's declaration fail to support his hostile environment claims since they inexplicably contradict his prior deposition testimony. It is well accepted in the Fifth Circuit that a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984) (citations omitted); *see also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("[T]his court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.") (citations omitted). In his declaration, Byrd states that Rawls ordered "me to use a large eight-foot roller that required me to reach overhead when he saw me waiting to use a smaller, four-foot roller that I could operate without exceeding my restrictions." (Byrd Decl. [35-1] at ¶ 5.) At deposition, however, Byrd provided that neither roller required "any overhead work." (Byrd Dep. [35-2] 20:15-19, 26:5-9.) Byrd's declaration also states that on March 21, Bennett "threaten[ed] to send me home with no pay." (Byrd Decl. [35-1] at ¶ 6.) Byrd previously testified that he brought up the idea of going home and only then did Bennett state, "[W]e can send you home but you ain't going to get paid for it." (Byrd Dep. [35-2] 29:11-15.) Byrd further declares, I "pled with all four levels of supervisors, to no avail," regarding assignments exceeding his medical restrictions. (Byrd Decl. [35-1] at ¶ 6.) This statement ignores and contravenes the following circumstances: (i) on or about March 12, Byrd failed to advise Rawls that a

work assignment exceeded his restrictions;[7] (ii) on March 19, Rawls withdrew a work assignment that Byrd stated was too big, and provided Byrd with a job that he was capable of performing;[8] (iii) on March 21, Bennett found work for Byrd within his restrictions and further instructed Tanner to prepare additional small tasks after Byrd told Bennett to find him work that did not exceed his limitations;[9] and (iv) also on March 21, Bennett's boss, Darrel Brewer, told Byrd not to do anything that exceeded his restrictions.  (*See* Byrd Dep. [35-2] 36:8-11, 79:25-80:8.)

Ultimately, the competent summary judgment evidence does not meet the Fifth Circuit's "high" legal standard for establishing unlawful harassment in the workplace. *Gowesky v. Singing River Hosp.*, Sys., 321 F.3d 503, 509 (5th Cir. 2003); *cf. Reine v. Honeywell Int'l Inc.*, 362 Fed. Appx. 395, 397-98 (5th Cir. 2010) ("The high standard for judging hostility is specifically intended to prevent Title VII from becoming a 'general civility code' for the workplace.") (quoting *Faragher*, 524 U.S. at 788).  As detailed in the preceding paragraph and Part I of this opinion, Byrd was only assigned three tasks that exceeded his work restrictions or limitations.  Byrd performed one without complaint; Rawls withdrew another after Byrd complained; and, Byrd may or may not have performed an additional task after Rawls stated, "[W]ell, we don't want you to hurt yourself but we need to get that one out."  (Byrd Dep. [35-2] 21:20-24.)  At some point, Rawls also told Byrd that he "ought to go have it [shoulder surgery] done, you know, get

---

[7] (*See* Byrd Dep. [35-2] 12:23-13:22.)

[8] (*See* Byrd Dep. [35-2] 14:6-23.)

[9] (*See* Byrd Dep. [35-2] 29:11-30:3, 34:13-35:1, 91:12-22.)

it done faster." (Byrd Dep. [35-2] 16:12-22.)[10]  On March 21, Bennett told Byrd that

Rawls said Byrd "wanted to go sit over there and wait for Reggie to get through all

night." (Byrd Dep. [35-2] 28:19-21.)[11]  Bennett also grinned and smiled and told Byrd

that "everybody that's been here 30 years is gone . . . ." (Byrd Dep. [35-2] 31:17-21,

37:6-8.)  Byrd may very well have *felt* harassed, insulted, or ridiculed at Huntington's

shipyard based on these facts.  Nonetheless, the foregoing circumstances fall well short

of creating a genuine issue for trial regarding *objectively unreasonable* age or disability-

based harassment "sufficiently pervasive or severe to alter the conditions of

employment and create an abusive working environment."  *Soledad v. U.S. Dep't of*

*Treasury*, 304 F.3d 500, 502-03, 506 (5th Cir. 2002) (affirming the trial court's dismissal

of the plaintiff's hostile work environment claim notwithstanding the plaintiff's supervisor

questioning the existence of the plaintiff's disability, making derogatory comments about

the plaintiff's diagnosis, making it difficult for the plaintiff to attend therapy sessions, and

sending the plaintiff a letter stating that he would be terminated because of a conflict

between the plaintiff's job requirements and work restrictions).[12]  Accordingly, summary

---

[10] Or, Rawls said he "should have the surgery done under insurance instead of workers comp" because "that is 'what [Rawls] did when [he] hurt his knee on a ship.'" (Byrd Decl. [35-1] at ¶ 5.)

[11] Or, Rawls said he "just want[ed] to sit on [his] butt for hours."  (Byrd Decl. [35-1] at ¶ 6.)

[12] *See also Jackson*, 2015 WL 585882, at *7-8 (affirming the trial court's grant of summary judgment on the plaintiff's hostile work claim under the ADEA since several comments to the effect that the plaintiff should retire were isolated and failed to affect the terms and conditions of employment); *Stewart*, 586 F.3d at 330-31 (holding that six offensive comments over the course of one month did not create a hostile environment); *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003) (agreeing with the defendant's argument that the plaintiffs' subjective beliefs regarding the defendant's intention to

judgment in favor of Huntington is due on Byrd's hostile work environment allegations under the ADA and ADEA.

## 2. Wrongful Termination Under the ADA and ADEA

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. § 623(a)(1).  Plaintiffs alleging they were discriminated against based on their age or disability may rely on direct or circumstantial evidence in proving their cases.  *See, e.g.*, *EEOC v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (ADA); *Moss v. BMC Software, Inc.*, 610 F.3d 917,

---

create a racially hostile environment were objectively unreasonable); *Gowesky*, 321 F.3d at 510-11 (finding that the placement of certain conditions on a hepatitis-C infected physician, like requiring the physician to inform patients and staff of her treatment for the virus, and the existence of alleged hurtful comments, such as I would not let you suture my child, failed to "reach the level of severity or pervasiveness that is required to create a fact issue on a hostile work environment claim"); *Necaise v. Grand Casinos of Miss., Inc.-Biloxi*, No. 1:04cv126, 2006 WL 3469604, at *4 (S.D. Miss. Nov. 30, 2006) (granting the defendant summary judgment on the plaintiff's disability-based harassment claim since his complaints of an incident involving management expressing hostility toward his absence, management moving meetings so that he would have to attend on his days off, and other similar events were not sufficiently severe); *cf. Dediol*, 655 F.3d at 441-43 (reversing the trial court's grant of summary judgment on the plaintiff's ADEA-based harassment claim where the plaintiff was called derogatory names—"'old mother******,' 'old man,' and 'pops'"—approximately six times per day for one and one-half months, and threatened with physical violence on numerous occasions); *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435-37 (5th Cir. 2005) (same result under Title VII based on the plaintiff being subjected to unwanted touching of her intimate body parts numerous times during a seven-month period).

922 (5th Cir. 2010) (ADEA). Circumstantial evidence cases, such as this one, are analyzed through the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a Title VII case. *See Gowesky*, 321 F.3d at 511. The Fifth Circuit employs the following modified *McDonnell Douglas* approach in suits alleging racial or disability discrimination:

> (1) the plaintiff must first establish a prima facie case of discrimination; (2) if such a showing is made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action; and (3) if the defendant satisfies that requirement, then the burden shifts back to the plaintiff to establish that the defendant's reason either is a pretext for discrimination *or* is only one of the reasons for its conduct and another *motivating factor* is the plaintiff's protected characteristic.

*Adeleke v. Dallas Area Rapid Transit*, 487 Fed. Appx. 901, 903 (5th Cir. 2012) (emphasis added) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

The Supreme Court has rejected the application of a "motivating factor" element to ADEA claims. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). To establish a disparate treatment claim under the ADEA, "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Id.* at 176 (citations omitted). That is, age must be "*the* '*reason*' that the employer decided to act." *Id.* (emphasis added). A claimant's ADEA claim will necessarily fail if the third stage of the *McDonnell Douglas* analysis merely shows that age was a motivating factor for the employment decision. *See Moss*, 610 F.3d at 928.

### a. ADA

#### i) Prima Facie Case

Byrd must meet the following elements in order to establish a prima facie case of disability discrimination: "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *LHC Group, Inc.*, 773 F.3d at 697 (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). In its opening brief in support of summary judgment, Huntington claims that Byrd's prima facie case fails because he cannot show that he was replaced by a non-disabled employee or treated less favorably than any non-disabled workers. This element is more suited to determining discriminatory hiring cases, and not controlling with respect to discriminatory discharge claims, such as the one alleged by Byrd. *Id.* at 696. Only in rebuttal does Huntington challenge Byrd's ability to meet any of the above-quoted prima face elements.

The Court typically does "not consider arguments raised for the first time in a reply brief . . . ." *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 492 (5th Cir. 2014) (citation omitted). Further, the Fifth Circuit often assumes, without deciding, that a plaintiff can establish a prima facie case of discrimination.[13] The Court will therefore assume *arguendo* that Byrd can prove a prima facie case under the ADA, and continue the *McDonnell Douglas* analysis.

### *ii) Legitimate, Nondiscriminatory Reason*

The employer's reason for the adverse employment action need not be persuasive or credible. *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509,

---

[13] *See, e.g.*, *Squyres v. Heico Cos.*, 782 F.3d 224, 231-32 (5th Cir. 2015); *Fahim v. Marriot Hotel Servs., Inc.*, 551 F.3d 344, 350 (5th Cir. 2008); *Williams v. Roy O. Martin Lumber Co.*, 51 Fed. Appx. 483, 2002 WL 31319337, at *4 (5th Cir. Sept. 30, 2002); *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 324, 325, 326 (5th Cir. 2002).

113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002). Instead, the defendant's burden is to "produce evidence 'which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 136 (2d Cir. 2000) (quoting *Hicks*, 509 U.S. at 509). Huntington has submitted evidence in support of its position that Byrd was terminated for the following misconduct: leaving his workstation without permission, driving the Mule without authorization, and wrecking/damaging the Mule on his way out of the shipyard. (*See* Moss Decl. [28-1] at ¶¶ 3-4; Tanner Decl. [28-4] at ¶ 3; Craft Decl. [28-5] at ¶ 3; Byrd Dep. [35-2] 54:14-16; Huntington 30(b)(6) Dep. [35-3] 25:22-26:16.) Taking this evidence as true, the Court finds that Huntington has articulated a legitimate, nondiscriminatory reason for the subject employment action. *Cf. Gonzales v. Dupont Powder Coatings USA, Inc.*, 546 Fed. Appx. 378, 379 (5th Cir. 2013) (affirming the district court's determination that the defendant met its burden of production in relying on the plaintiff's safety violations as the basis for his discharge); *Calvert v. Eljer Plumbingware, Inc.*, No. 1:04cv49, 2005 WL 1683780, at *7 (N.D. Miss. July 19, 2005) (finding a legitimate, nondiscriminatory reason where the defendant maintained that the plaintiff was discharged for leaving work without authorization).

### *iii) Pretext - Motivating Factor*

Byrd must now present sufficient evidence for a reasonable factfinder to conclude either (1) Huntington's reason is a pretext for discrimination or (2) Huntington's reason, while true, is only one of the reasons for the discharge and another motivating factor was Byrd's actual or perceived disability. *See Adeleke*, 487 Fed. Appx. at 903.

Pretext may be shown "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Moss*, 610 F.3d at 922 (citation and internal quotation marks omitted). Byrd has failed to produce evidence of Huntington not firing any non-disabled employee accused of substantially the same misconduct as himself. *See Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) ("To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances, was treated differently.") (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)). Byrd also cannot directly discredit Huntington's bases for his termination given his lack of memory regarding the salient events on March 21. "Since my impaired mental state left me with *no recollection of the incident*, I can only say with certainty that I did not consciously or intentionally destroy company property on Mar. 21, 2012." (Byrd Decl. [35-1] at ¶ 9) (emphasis added).

Byrd nonetheless appears to claim pretext via the following argument: "Defendant's explanation that they fired Mr. Byrd for 'deliberately destroying company property' without even addressing the medical restrictions and work assignment issues is irrational and unworthy of belief." (Pl.'s Mem. in Opp. to Mot. for SJ [36] at pp. 19-20.) This argument ignores key parts of the summary judgment record. Byrd testified at deposition that he was not given an assignment that exceeded his restrictions on March 21, the date Huntington claims he destroyed company property. (*See* Byrd Dep. [35-2] 64:22-65:6.) Byrd further testified that James Moss, one of the individuals responsible for the termination decision, asked him what happened and what his blood sugar was on the date of the incident. (*See* Byrd Dep. [35-2] 67:16-19, 68:24, 69:14-19.) Byrd told

Moss that he was being pushed too hard at work; that his blood sugar was normal according to the hospital record; and, that he could not remember the incident.  (*See* Byrd Dep. [35-2] 67:20-68:1,68:22-69:2, 71:10-16.)[14]  Moss's declaration confirms Byrd's indication "that his blood sugar had been checked at the hospital on the evening of the incident and was found to be normal."  (Moss Decl. [28-1] at ¶ 4.)  Moss also provides that he communicated with Byrd's managers regarding the possibility of Byrd being given assignments that violated his medical restrictions.  (Moss Decl. [28-1] at ¶ 5.)  Byrd's conclusory and speculative pretext argument is contradicted by the foregoing facts and fails to give rise to a jury issue.  *Cf. Turner*, 476 F.3d at 345-47 (holding that the plaintiff's conclusory statements did not create a fact issue regarding the defendant's rationale for her termination being pretextual).

Byrd also appears to claim that his conduct on March 21 resulted from a combination of stress and a blood sugar imbalance or problem.  However, Byrd's proof of a blood sugar problem consists of what others, such as the emergency room physician, purportedly told him.[15]  As correctly argued by Huntington, these hearsay

---

[14] Post-deposition, Byrd declares that Moss only asked him about his blood sugar, and that he explained to Moss his blood sugar was taken several hours after he was able to consume a banana and soft drink.  (*See* Byrd Decl. [35-1] at ¶ 9.)  These statements contradict Byrd's prior deposition testimony and do not factor into the Court's summary judgment analysis.  *See S.W.S. Erectors, Inc.*, 72 F.3d at 495; *Albertson*, 749 F.2d at 228.  The Court likewise discounts Byrd's post-deposition statement regarding his explanation to Moss that the alleged misconduct was totally out of character with his 33-year work record.  (*See* Byrd Decl. [35-1] at ¶ 9.)  Byrd failed to mention this circumstance at his deposition despite being repeatedly asked to state everything he recalled about the meeting on April 24.  (*See* Byrd Dep. [35-2] 68:2-7, 71:22-25.)

[15] As noted above, the Hospital Records [28-8] from March 21 make no mention of a blood sugar imbalance.

statements do not constitute competent summary judgment evidence.  *See Harris ex rel. Harris v. Pontotoc County Sch. Dist.*, 635 F.3d 685, 692 (5th Cir. 2011) (providing that hearsay cannot be used to avoid summary judgment) (citation omitted).  Moreover, liability will not attach even if Huntington got it wrong by confusing Byrd's blood sugar induced behavior with intentional misconduct.  "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."  *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (citation omitted); *see also Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification.") (citation omitted).  Judicial second-guessing of an employment decision, effectively transforming a court into a super personnel manager, is proscribed within the Fifth Circuit.  *See, e.g.*, *LaMaire*, 480 F.3d at 391; *Fife v. Vicksburg Healthcare, LLC*, 945 F. Supp. 2d 721, 738 (S.D. Miss. 2013).  Based on the foregoing, Bryd's unsupported contention that Huntington's rationale for his discharge is a pretext for disability discrimination will not proceed to trial.

Viewing the facts and the resulting inferences in Byrd's favor, the Court also finds an absence of proof supporting the contention that Byrd's actual or perceived disability was a motivating factor for Huntington's termination decision.  At most, Byrd has presented his own theories and beliefs regarding "significantly-younger, less-experienced supervisors" targeting and pressing him "to the point . . . [where he] broke down because of their deliberate failure to accommodate" his restrictions.  (Byrd Decl. [35-1] at ¶ 11.)  No reasonable jury could view the evidence before the Court, discussed

in the preceding sections of this opinion, and accept Byrd's subjective beliefs as proof of disability discrimination.  *See Giles v. City of Dallas*, 539 Fed. Appx. 537, 545 (5th Cir. 2013) (ruling that the plaintiff's Title VII claims failed as a matter of law in part because he was unable to cite any evidence in the motivating factor analysis aside from  his own subjective beliefs).[16]  Therefore, Huntington will be granted summary judgment on Byrd's ADA claim for wrongful termination.

### b.    ADEA

#### i) Prima Facie Case

Byrd must show the following in order to establish a prima facie case of discrimination under the ADEA:  (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of the discharge; and (4) he was replaced by either someone younger or someone outside the protected class, *or* otherwise terminated because of his age.  *See Phillips*, 658 F.3d at 455 (citing *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004)).  Huntington's opening brief in support of summary judgment does not challenge the first three elements of Byrd's prima face case.  As to the last element, Huntington initially argues that Byrd has failed

---

[16] *See also Nichols v. Lewis Grocer*, 138 F.3d 563, 570 (5th Cir. 1998) (A "plaintiff's own good faith belief that [her] sex motivated [her] employer's action is of little value.") (quoting *Little*, 924 F.2d at 96); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (a plaintiff's mere subjective belief concerning the existence of discrimination fails to establish pretext) (citation omitted); *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995) (affirming the district court's grant of judgment as a matter of law in favor of the defendant since the evidence consisted of the EEOC's speculation that the defendant's failure to promote decision was motivated by an employee's age); *cf. Lechuga v. S. Pac. Transp. Co.*, 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment.") (citations omitted).

to identify any younger employee receiving more favorable treatment. This opening argument overlooks a claimant's ability to meet the fourth element by showing that she was "otherwise discharged because of her age." *Id.* Thus, for essentially the same reasons presented in the Court's discussion of Byrd's prima facie case under the ADA, the Court will assume, without deciding, that Byrd can establish a prima face case of age discrimination.

### ii) Legitimate, Nondiscriminatory Reason

Huntington's stated reason for Byrd's termination, discussed above, suffices to move the *McDonnell Douglas* inquiry forward under the ADA and ADEA.

### iii) Pretext

As previously mentioned, the motivating factor analysis is inapplicable to Plaintiff's claim of discrimination under the ADEA. *See Gross*, 557 U.S. at 180. Byrd must show Huntington's rationale for his discharge to be pretextual and that age discrimination was the real or but-for reason. *See Kean v. Jack Henry & Assocs., Inc.*, 577 Fed. Appx. 342, 350 (5th Cir. 2014) (citations omitted). No reasonable juror would find Huntington's reason for Byrd's discharge to be false and Byrd's age to be the "but-for cause of the . . . adverse decision"[17] in light of the following testimony from Byrd:

> Q.    Okay. Do you believe that you were fired because of your age?
>
> A.    I've thought about that long and hard. I really don't know why.
>
>       . . . .
>
> Q.    Okay. Did anything happen during any of this that made you believe or that makes you believe that you got fired because of your age?

---

[17] *Squyres*, 782 F.3d at 231 (citations and internal quotation marks omitted).

A.      I don't know the reasons.

Q.      Okay.  Did anything happen that made you feel you got fired for any reason other than the fact that you walked off the job and took the mule and wrecked the mule?

A.      Rephrase that.

Q.      Okay.

A.      I mean, you're kind of leaving it broad.

Q.      Your understanding, you came into a meeting in April.  This is after you had surgery.

A.      Right.

Q.      And you came to a meeting at which you got fired.

A.      Uh-huh (indicating yes).

Q.      Right?

A.      Right.

Q.      And you were told in the meeting that you were being fired for misconduct?

A.      Right.

Q.      And the misconduct, as you understood it, was that you left work, you left your work station, you took a mule that you didn't have authority to take and you wrecked it and walked out the gate, right?

A.      Right.

Q.      Now, do you have any basis for claiming that you got fired for any reason other than that?

A.      Why else would they have fired me?

Q.      I don't know.  I'm asking you the basis for your lawsuit.

        . . . .

A.      Yeah.  Well, I don't believe my bosses would have fired me.  I don't believe that's the way it went down.  I don't know.  Cause Darrel Brewer told L.C. Tanner it was a done deal when he got there.  He never said nothing.  That's why I don't understand it.  I mean, cause I put in a lot of years with that place and I got a medical problem and then I'm throwed out like the evening trash.

(Byrd Dep. [35-2] 49:24-50:2, 51:1-52:7, 52:11-18.)

Byrd's testimony that general foreman Tommy Bennett "made the remark . . . everybody that's been here 30 years is gone" during their argument on March 21 fails to create a genuine issue for trial.  (Byrd Dep. [35-2] 37:6-8.)  The Fifth Circuit has found sporadic age-based comments made by individuals other than ultimate decision-makers not to constitute evidence of pretext.  *See Squyres*, 782 F.3d at 235-36; *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441-42 (5th Cir. 2012).  Byrd and Bennett usually got along well at work outside of their heated exchange on March 21.  (*See* Byrd Dep. [35-2] 33:13-24; Bennett Decl. [37-2] at ¶ 7.)  Byrd also does not "believe . . . [his] bosses would have fired" him.  (Byrd. Dep. [35-2] 52:11-12.)  This belief comports with James Moss's statement that the decision to terminate Byrd was made by Ray Doty and himself.  (*See* Moss Decl. [28-1] at ¶ 4.)

Even if Bennett's remark could be considered discriminatory in nature, "[a] mere scintilla of evidence of pretext does not create an issue of material fact in all cases." *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902-03 (5th Cir. 2000) (citing *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 301 (5th Cir. 2000)).  Byrd has failed to identify any other competent evidence potentially giving rise to an inference of age discrimination.  Therefore, the third stage of the *McDonnell Douglas* analysis falls in

Huntington's favor and it will be granted summary judgment on Byrd's wrongful discharge claim under the ADEA.

### 3. Intentional Infliction of Emotional Distress

Huntington seeks summary judgment on Byrd's claim for intentional infliction of emotional distress on two grounds: (1) the claim is barred by the one-year statute of limitations prescribed by section 15-1-35 of the Mississippi Code;[18] and (2) the facts alleged by Byrd fall well short of the "extreme and outrageous" conduct required in order to sustain liability on such a claim. *Brown v. Inter-City Fed. Bank for Savings*, 738 So. 2d 262, 265 (¶ 9) (Miss. Ct. App. 1999) (citation omitted). Byrd's summary judgment response fails to defend against the dismissal of this claim. The Court finds Huntington's grounds for dismissal well taken and that Byrd has abandoned his claim for intentional infliction of emotional distress.[19] Accordingly, summary judgment will also be granted in favor of Huntington on this cause of action.

### 4. Huntington's Counterclaim for Damage to the Mule

Huntington seeks summary judgment on its counterclaim for the value of the Mule. Huntington asserts that it is undisputed Byrd was unauthorized to operate the

---

[18] *See Jones v. Fluor Daniel Servs. Corp.*, 32 So. 3d 417, 423 (¶ 26) (Miss. 2010).

[19] *See Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) (finding that plaintiffs abandoned their claim for tortious breach of contract when their summary judgment response was limited to their bad faith claim); *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (holding that the plaintiff's failure to pursue a claim beyond her complaint resulted in abandonment); *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.") (citation omitted).

vehicle, he wrecked it, and it could not be repaired.  Huntington has submitted a

declaration from Chris Helton, the manager of facilities engineering and planning at the

shipyard, in support of summary judgment.  Helton states that the Mule could not be

repaired after Byrd wrecked it due to a bent frame, and that the average retail price of a

2007 Kawasaki Mule as of November, 2014, was $4,100.  (*See* Helton Decl. [28-7] at ¶

3.)  Byrd argues that the counterclaim is time-barred under section 15-1-35 because it

asserts an intentional tort claim and more than one year passed between the March 21,

2012 incident and the filing of the counterclaim.  In rebuttal, Huntington argues that

Byrd's taking of the Mule constitutes the tort of conversion, which is subject to the three-

year statute of limitations prescribed by section 15-1-49 of the Mississippi Code.

Huntington will bear the burden of proof at trial on its counterclaim.  The party

possessing the burden of proof on a matter must show beyond peradventure all of its

essential elements in order to obtain summary judgment.  *See Fontenot*, 780 F.2d at

1194.  Huntington's opening brief in support of the subject motion fails to identify the

legal theory under which it seeks damages from Byrd, much less does it establish the

essential elements of any tort.  Only in rebuttal does Huntington asserts its right to

recovery under the tort of conversion.  The Court typically does "not consider arguments

raised for the first time in a reply brief . . . ."  *Transocean Deepwater Drilling, Inc.*, 767

F.3d at 492.

In addition, Byrd has testified that he does not recall the incident involving the

Mule and that it was "like being in a fog."  (*See* Byrd Dep. [35-2] 40:8-11, 41:15-21,

43:16-17, 116:4-5.)  This testimony is arguably supported by Byrd's family members'

statements that he was totally "out of it" and "very confused" upon his return home from

the shipyard.  (Melissa Byrd Decl. [35-4] at ¶ 7; John Byrd Decl. [35-5] at ¶ 4.)  The Court declines to hold as a matter of law that Byrd *intended* to destroy the Mule, deprive Huntington of its use, or appropriate the property to himself given these particulars.  *See Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 68-69 (Miss. 2004) (discussing the elements of conversion) (citations omitted).  Therefore, Huntington's request for summary judgment on its counterclaim will be denied.

### III.  CONCLUSION

Huntington is entitled to summary judgment on Byrd's claims, but not its counterclaim.

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment [28] is granted in part and denied in part.  Plaintiff's claims against Defendant Huntington Ingalls, Incorporated are dismissed with prejudice.  Defendant's counterclaim for damage to a company vehicle remains pending for trial.

SO ORDERED AND ADJUDGED this the 8th day of May, 2015.


*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE